**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John HOUSE, James Hughes,
and Tommie Lee White,
Defendants–Appellants.**

Nos. 96–2658, 96–2576 and 96–2773.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1997.

Decided April 8, 1997.

Donna R. Eide (argued), Melanie C. Conour, Office of the United States Attorney, Indianapolis, IN, for U.S.

William E. Marsh (argued), Indiana Federal Community Defenders, Inc., Indianapolis, IN, for James E. Hughes.

Robert C. Perry, William E. Marsh (argued), Indianapolis, IN, for John House.

Carolyn W. Rader, William E. Marsh (argued), Crawford & Rader, Indianapolis, IN, for Tommie L. White, Jr.

Before CUMMINGS, BAUER, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Appellants John House, James Hughes, and Tommie Lee White pled guilty to both counts of a two-count indictment charging them, along with seven others, with conspiring to possess and distribute controlled substances in violation of 21 U.S.C. § 841 and § 846 and with conspiring to launder money in violation of 18 U.S.C. § 1956(h). Appellants raise several issues on appeal, all of which concern their sentences: (1) House claims that the district court clearly erred in finding that he was an organizer or leader of the conspiracy; (2) Hughes and White contend that the district court clearly erred in calculating the amount of money attributable to them; (3) Hughes challenges the district court's calculation of the amount of marijuana attributable to him; (4) White argues that the district court clearly erred in finding that he was a manager or supervisor of the conspiracy; and (5) all three of the appellants maintain that the district court applied an incorrect base offense level in sentencing them on the money laundering count. We conclude that the district committed no error in sentencing appellants and therefore affirm.

I.

■ The charged conspiracy, which lasted from August 1993 until February 1995, involved the transportation of marijuana and cocaine from California to Indiana. The proceeds of the Indiana drug sales were then returned to California via Western Union wire transfer. Although appellants admitted their participation in both the drug and money laundering conspiracies, they challenged at sentencing the government's evidence as to the scope of their individual involvements in the conspiracies and the amount of drugs and money attributable to them. They now appeal the district court's findings on these issues. Because a district court's characterization of a defendant's role in an offense and its determination of the quantities of drugs and money attributable to a defendant are factual determinations, we review these findings for clear error only. See *United States v. Thomas,* 86 F.3d 647, 655 (7th Cir.), *cert. denied, Story v. United States,* —— U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996); *United States v. Herrera,* 54 F.3d 348, 356 (7th Cir.), *cert. denied, Crespo v. United States,* —— U.S. ——, 116 S.Ct. 192, 133 L.Ed.2d 128 (1995); *United States v. James,* 40 F.3d 850, 870 (7th Cir.1994); *United States v. Goines,* 988 F.2d 750, 775 & 777 (7th Cir.1993). Under this standard, we will vacate appellants' sentences only if the district court's findings are without foundation in the evidence, such that we are "left with the definite and firm conviction that a mistake has been committed." *Herrera,* 54 F.3d

at 356 (internal quotations omitted); *accord James,* 40 F.3d at 870.

We first address House's contention that the district court erred in finding that he was a leader or organizer of the conspiracy. Under section 3B1.1(a) of the United States Sentencing Commission Guidelines, "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the defendant's base offense level is increased by four levels.[1] The Commentary to this section directs the sentencing court to consider a variety of factors in determining whether a defendant acted in an organizational role, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control exercised over others." U.S.S.G. § 3B1.1, comment. (n.4).

■ Taking into account these factors, the sentencing judge concluded that House was a central figure in the drug and money laundering conspiracies. The district court found that House controlled who would receive the drugs, how much they would receive, and from whom they would receive them. As for the money laundering conspiracy, the court found that, although the wires were sent and received under a variety of names, House ultimately received the proceeds. In addition, the court concluded that House was "the common connection between ... virtually everyone named as a coconspirator" and that "he brought ... people together, both

individually and as a group, to further the business of the conspiracies." These findings were supported by the testimony of Agent Steven C. Weida, an agent involved in the investigation of the conspiracy. He testified that House controlled the supply side of the cocaine and marijuana business and provided detailed testimony regarding statements made by several coconspirators as to House's role as the supplier in the various drug transactions involved in this conspiracy. He also testified that several of House's relatives, as well as two women described by Agent Weida as House's girlfriends, transported drugs and picked up wire transfers at House's direction. This testimony provided ample support for the district court's findings that House had substantial decision-making authority over the supply side of the drug business and that he recruited and directed others to transport drugs and receive wire transfers, the proceeds from which were returned to him. The district court committed no error in increasing House's offense level to reflect his role as an organizer and leader of the conspiracy.

■ We turn next to Hughes' and White's contention that the district court erred in attributing $600,000 of laundered money to them. Along the same line, Hughes complains that the court erred in attributing 400 kilograms of marijuana to him. The $600,000 of laundered funds and the 400 kilograms of marijuana are the amounts estimated to have been the total funds laundered and the total amount of the marijuana sold in furtherance of the conspiracies.[2] Because a sentencing court is required to take into account not only the acts of a defendant charged with conspiracy, but also "all reasonably foreseeable acts and omissions of others

---

1. House does not dispute that there were five or more participants in the conspiracy, only whether he played an organizational or leadership role with respect to these participants.

2. The amount of money estimated from the documented wire transfers alone to have been laundered in furtherance of the conspiracy was $664,520. The district court's estimate that more than $600,000 was laundered is therefore more than supported by the record. The amount of marijuana involved in the conspiracy was estimated based on statements made to investigators by cooperating coconspirators to have been be-

tween 400 and 700 kilograms. For example, Orlando Jordan, one of the indicted coconspirators, stated that there were between twelve and thirteen shipments of marijuana by U–Haul truck and that each shipment contained between 80 and 110 pounds of marijuana. This estimate alone, which does not take into account the drugs transported by mail or by commercial airline, supports the district court's finding that more than 400 kilograms of marijuana was involved in the conspiracy. Both estimates are conservative given the evidence presented at sentencing.

in furtherance of the jointly undertaken criminal activity," these total amounts would be attributable to a defendant found to have reasonably foreseen the scope of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B); see also *United States v. Zarnes,* 33 F.3d 1454, 1474 (7th Cir.1994); *Goines,* 988 F.2d at 775. Based on its finding that the scope of the conspiracy was reasonably foreseeable to Hughes and White, the court attributed these total amounts to them.

Hughes points this court to the district court's findings that he was personally involved in the receipt of thirty-two wire transfers, totaling an amount in excess of $87,000, and that he personally drove another individual to Western Union to pick up wire transfers for House. He does not contest these findings, rather, he argues these findings cannot support the district court's conclusion that $600,000 in laundered funds were attributable to him. It is clear, however, that the court did not arrive at a figure of $600,000 by adding up the amount of funds personally laundered by Hughes. The crux of the court's findings was that Hughes was involved in the drug and money laundering conspiracies from "top to bottom." In addition to his own participation in receiving money orders and packaging and delivering substantial quantities of drugs, he transported other individuals to the airlines for the purpose of transporting drugs and to Western Union for the purpose of picking up wire transfers. These findings support the court's determination that the extent of the conspiracy was reasonably foreseeable to Hughes. An amount in excess of $600,000 was therefore properly attributable to him.[3]

Hughes also challenges the district court's determination that he was responsible for more than 400 kilograms of marijuana. The district court heard testimony from Agent Weida summarizing the statements of several of Hughes' coconspirators, which indicated that Hughes was involved in packaging marijuana for shipment starting in the late summer of 1993,[4] that he transported marijuana by commercial airlines, and that he personally transported marijuana by U–Haul truck on approximately ten occasions. According to the testimony of Orlando Jordan, a coconspirator, these shipments by U–Haul truck each contained between 80 and 110 pounds of marijuana. The statements made by various coconspirators would have supported a figure of between 400 and 700 kilograms of marijuana. The only evidence supporting a lower quantity was Hughes' own testimony. While he admits that his coconspirators' statements support the court's quantity determination, he maintains that the court's decision to credit the hearsay statements of his coconspirators over his own testimony was error. Hughes appears to be arguing that his coconspirators' statements are so selfserving that any decision to credit these statements is clearly erroneous.

This argument is without merit. "[T]he witnesses' motives for testifying do not render their testimony inherently unreliable." *United States v. Garcia,* 66 F.3d 851, 857 (7th Cir.1995); *see United States v. Crockett,* 82 F.3d 722, 727 (7th Cir.1996) (upholding district court's decision to credit coconspirator testimony); *James,* 40 F.3d at 871 (same). As this court has held countless times, sentencing judges are fully capable of

---

**3.** Hughes also argues that the district court employed an impermissible method of estimating the value of money laundered under this court's decision in *United States v. Atterson,* 926 F.2d 649 (7th Cir.1991). In *Atterson,* we held that the sentencing court erred in adding to the amount of funds laundered the approximate street value of the total quantity of marijuana found to have been involved in the drug conspiracy in the absence of evidence that the proceeds were in fact laundered. *Id.* at 660. *Atterson* is irrelevant to the instant case, as the value of the funds laundered was determined from documented wire transfers.

**4.** Hughes specifically challenges the district court's finding that he was involved in the conspiracy prior to the summer of 1994. James Fillmore, an indicted coconspirator, indicated that he taught Hughes to wrap marijuana for shipment through the mail just prior to the fall of 1993. He testified that House directed him to do so. Fillmore then moved to Indiana and began distributing marijuana for House. Fillmore received the packages of marijuana from House wrapped in the manner he had taught Hughes. Therefore, the record supports the district court's determination that Hughes became involved in the conspiracy by wrapping marijuana for House prior to the fall of 1993.

considering the motivations of witnesses in weighing conflicting evidence and, because they have had an opportunity to assess the demeanor of the witnesses, are in a better position than this court to make credibility determinations. *See Garcia*, 66 F.3d at 858; *United States v. Beal*, 960 F.2d 629, 634 (7th Cir.1992). For this reason, arguments which simply urge a reassessment of a district court's credibility determination "are wasted on an appellate court." *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989) (rejecting argument that district court erred in crediting testimony of "an admitted liar, convicted felon, large scale drug-dealing, paid government informant"); *see also Crockett*, 82 F.3d at 727 (stating that testimony of admitted drug user not unreliable because drug use is factor which can be weighed in determining credibility). The district court committed no error in crediting the statements made by Hughes' coconspirators over Hughes' own self-serving testimony. This is especially true given that the total amount of the documented wire transfers does not support Hughes' claim that the amount of drugs involved was less than that suggested by his coconspirators.

 Hughes also complains that the unreliability of his coconspirators' statements was compounded because the statements were summarized by Agent Weida—in other words, that the statements were hearsay. The sentencing judge committed no error by considering this hearsay evidence. As we have held on many occasions, reliable hearsay is admissible at sentencing. *United States v. Gerstein*, 104 F.3d 973, 978 (7th Cir.1997); *Garcia*, 66 F.3d at 857; *United States v. Nelson*, 39 F.3d 705, 710 (7th Cir. 1994); *Beal*, 960 F.2d at 634. Hearsay is in fact "a staple in sentencing." *United States v. Escobar–Mejia*, 915 F.2d 1152, 1154 (7th Cir.1990). "To use evidence during sentencing, the judge must only decide that the evidence is reliable and must allow the defendant an opportunity to rebut." *Nelson*, 39 F.3d at 710. As we noted above, the sentencing court found Agent Weida's testimony to be reliable and we see no reason to upset that court's determination. Hughes was permitted to examine Agent Weida extensively regarding his recollection of the statements,

the consistency with which the coconspirator made the statements, and the extent to which the statements were corroborated by other evidence. Agent Weida's testimony was therefore properly considered by the sentencing judge.

White also argues that the district court clearly erred in finding that the amount of laundered funds attributable to him was in excess of $600,000. His arguments essentially echo those raised by Hughes; he complains that Agent Weida's testimony was unreliable because the evidence presented by Agent Weida was based in part on the hearsay statements of coconspirators who had agreed to cooperate with the government. He contends that the judge clearly erred in crediting these statements over his version of events, which he presented in a letter to the court. Without belaboring the point, we reiterate that the sentencing judge's credibility determinations are entitled to considerable deference. With respect to White's credibility, the court stated:

> To the extent that the defendant's letter constitutes a denial and the cross-examination of Agent Weida pointed out that the evidence upon which Mr. Weida was relying in part was given by coparticipants in the criminal activities and others who may have sought some benefit, I do find the presentation of Agent Weida, though it incorporates that type of evidence, to be more credible than the presentation of the letter. The letter ... is not subjected to cross-examination and is rather self-serving and appears to be a late effort by Mr. White to minimize his role in the offense. And I find the credibility of the other participants as communicated through Agent Weida to be superior to Mr. White's credibility in that regard. And that the information provided by others to Agent Weida is more believable on these points.

Because the court found Agent Weida's summary of the statements made by White's coconspirators to be reliable evidence, a finding to which we will defer, and permitted White to rebut these statements, the court committed no error in considering these

statements, or in crediting them over White's letter of denial.

As for White's role in the conspiracy, the district court found that White was a manager or supervisor. Section 3B1.1(b) of the Guidelines states: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." "A defendant is a 'manager' if he exercised *some* control over others involved in the commission of the offense." *United States v. McGuire*, 957 F.2d 310, 316 (7th Cir.1992) (emphasis in original) (internal quotations omitted). While the criminal activity must involve five or more participants, "there is no requirement in § 3B1.1(b) that a defendant control the activities of all the participants in the criminal activity."[5] *Id.* In explaining its award of a three-level increase, the court cited White's involvement in recruiting other members of the conspiracy, in directing the transportation of the marijuana, and in negotiating the drug transactions.

Our review of the sentencing transcript reveals that there was more than sufficient evidence in the record to support the court's finding that White played a managerial role in the conspiracy. Agent Weida testified that White was arrested while transporting marijuana to Indianapolis by commercial airline and that White had transported drugs and money by U–Haul truck on at least two occasions. According to Tanisha Lyons, a coconspirator, White directed her to transport marijuana from San Diego to Indianapolis on two occasions and to pick up wire transfers on several other occasions. As to White's involvement in the money laundering conspiracy, Agent Weida testified that an employee of an Indianapolis check cashing business stated that she had known White for more than a year and that he "would come in with two or three people at a time and they would make wire transfers between

$2,000 and $3,000 each. He would provide the funds for the people and the documents ... showing where [the money was] going." According to Agent Weida, the testimony of the employee of the check cashing business was supported by the statements of three other individuals who claimed to have made wire transfers at White's request. This evidence provides support for the district court's findings that White played a substantial role in directing the distribution of marijuana and in recruiting and directing others to pick up wire transfers. The court's conclusion that White was a manager or supervisor is therefore not clearly erroneous.

## II.

Appellants' final contention is that the district court applied an incorrect base offense level in sentencing them on the money laundering count. Appellants pled guilty to conspiring to conduct a financial transaction with the proceeds of an unlawful activity in violation of 18 U.S.C. § 1956(h). According to the appellants' plea agreements, this conspiracy had three objectives:

(1) to promote the carrying on of a specified unlawful activity, in violation of section 1956(a)(1)(A)(i); (2) to conceal the ownership or control of the specified unlawful activity in violation of section 1956(a)(1)(B)(i); and (3) to avoid a transaction reporting requirement under state or federal law, in violation of section 1956(a)(1)(B)(ii). In sentencing defendants for money laundering, the district court applied a base offense level of twenty-three. As we recently held in *United States v. Monem*, 104 F.3d 905 (7th Cir. 1997), twenty-three is the appropriate base offense level for conspiring to violate section 1956(a)(1)(A)(i), which makes it unlawful to conduct a financial transaction with proceeds known to be from a specified unlawful activity with the intent of promoting the carrying on of an unlawful activity.[6]

---

5. White does not dispute that the conspiracy involved five or more participants.

6. Although appellants argued in their briefs that the base offense level for conspiring to violate section 1956(a)(1)(A) was twenty, counsel for appellants appears to have abandoned this argument at oral argument in light of this court's decision in *Monem*, decided after the briefing of this case. Because we believe *Monem* was correctly decided, to the extent that counsel has not waived this argument, it is rejected.

*Id.* at 907–09. Under the Sentencing Guidelines, the higher base offense level of twenty-three, as compared to the base offense level of twenty that is applicable to other money laundering offenses, is applied in sentencing defendants whose commission of a money laundering offense "encouraged or facilitated the commission of further crimes,"—in this case, the ongoing drug conspiracy. *See* U.S.S.G. § 2S1.1, comment. (backg'd).

Although appellants do not appear to challenge this court's holding in *Monem,* they argue that it is unclear whether they pled guilty to conspiring to violate section 1956(a)(1)(A)(i). Appellants contend that, in pleading guilty to the conspiracy and acknowledging the existence of a factual basis to support their plea agreements, they admitted only that one of these three illegal acts was the object of the conspiracy, not that all three acts were objects of the conspiracy. We, however, find no ambiguity in appellants' plea agreements, which clearly state that the appellants pled guilty to engaging in a conspiracy to violate sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) and (ii). The government presented considerable evidence through the testimony of Agent Weida at appellants' change of plea hearings and sentencing hearings to support their guilty pleas, including the government's allegations that the money laundering was done to promote the ongoing drug conspiracy and to ensure future deliveries of drugs. This is an allegation which none of the appellants challenged at sentencing.[7] We therefore conclude that the district court correctly applied a base offense level of twenty-three in sentencing defendants on the money laundering count.

For the foregoing reasons, the sentences imposed by the district court are AFFIRMED in all respects.

---

7. In fact, at White's sentencing hearing, the sentencing judge explicitly asked counsel: "And you don't dispute the object of the laundering was to promote drug activity?" To this, counsel responded: "That's correct."